1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| WILLIAM HEATHCOTE individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>        v.<br><br>GRANDE GAMES LIMITED,<br><br>        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff William Heathcote ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Grande Games Limited ("Defendant" or "Grande Games").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

<u>**NATURE OF THE ACTION AND FACTS COMMON TO ALL CLAIMS**</u>

1.      Defendant Grande Games Limited owns and operates a leading video game development company in the so-called "casual games" industry – that is, computer games designed to appeal to a mass audience of casual gamers.  Amongst the games Defendant owns and operates are popular virtual casino games, including a virtual casino game under the name "Cash Frenzy™ Casino – Free Slots Games," hereinafter "Cash Frenzy Casino."

2.      In Cash Frenzy Casino, Defendant offers a multitude of electronic versions of slot

machine games.  Cash Frenzy Casino is available on Android and Apple iOS devices.

3.      Defendant provides a bundle of free "coins" to first-time visitors of its virtual casino that can be used to wager on its slot machine games.  After consumers inevitably lose their initial allotment of coins, Defendant attempts to sell them additional coins starting at $1.99 for 750,000 coins.

4.      Freshly topped off with additional coins, consumers wager to win more coins.  The coins won by consumers playing Defendant's games of chance are identical to the coins that Defendant sells.  Thus, by wagering 750,000 coins that were purchased for $1.99, consumers have the chance to win millions of additional coins that they would otherwise have to purchase.

5.      These coins permit consumers to have the privilege of playing Defendant's games.

6.      By operating its virtual casino, Defendant has violated Washington law, which governs Plaintiff's and the Class's claims, and illegally profited from tens of thousands of consumers.  Accordingly, Plaintiff, on behalf of himself and a Class of similarly situated individuals, brings this lawsuit to recover their losses, as well as costs and attorneys' fees.

## PARTIES

7.      Plaintiff William Heathcote is a natural person and a citizen of the state of Washington.  In or around Spring 2020, Plaintiff began playing Cash Frenzy Casino through his Coolpad cellular phone.  After Plaintiff lost the balance of his initial allocation of free coins, Plaintiff began purchasing coins from Defendant for use in the Cash Frenzy Casino.  Thereafter, Plaintiff continued playing various slot machines and other games of chance within Defendant's casino where he would wager coins for the chance of winning additional coins.  From June 2020 to August 2020, Plaintiff wagered and lost (and Defendant therefore won) approximately $300 at Defendant's games of chance.

8.      Defendant Grande Games Limited is a Chinese company with its principal place of business located in Hong Kong.  Defendant conducts business throughout this District, Washington state, and the United States.

---

CLASS ACTION COMPLAINT
CASE NO.

BURSOR & FISHER, P.A.
888 SEVENTH AVENUE
NEW YORK, NY 10019

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

10.     This Court has personal jurisdiction over Defendant because Defendant conducts significant business in this District, and because the wrongful conduct occurred in this District.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

**Free-to-Play and the New Era of Online Gambling**

12.     The proliferation of internet-connected mobile devices has led to the growth of so-called "free-to-play" videogames.  With free-to-play games, developers encourage consumers to download and play games for free while selling many low-cost items within the game itself. Developers aim to recoup their costs (and make a profit) by selling thousands of "in-game" items that start at $0.99 (purchases known as "micro-transactions") instead of charging an up-front fee.

13.     The free-to-play model has become particularly attractive to developers of games of chance (*e.g.*, slot machine mobile video games), because it allows them to generate huge profits. In 2012, free-to-play games of chance generated over $1.6 billion in worldwide revenue.

14.     With free-to-play games of chance, developers have begun exploiting the same psychological triggers as casino operates.  As one respected videogame publication put it:

> If you hand someone a closed box full of promised goodies, many
> will happily pay you for the crowbar to crack it open. The
> tremendous power of small random packs of goodies has long been
> known to the creators of physical collectible card games and
> companies that made football stickers a decade ago. For some …
> the allure of a closed box full of goodies is too powerful to resist.
> Whatever the worth of the randomised [sic] prizes inside, the offer
> of a free chest and the option to buy a key will make a small

---

CLASS ACTION COMPLAINT
CASE NO.

BURSOR & FISHER, P.A.
888 SEVENTH AVENUE
NEW YORK, NY 10019

fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[1]

15.     *Game Informer*, another respected videogame magazine, reported on the rise (and danger of) micro-transactions in free-to-play games and concluded:

[M]any new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling.[2]

16.     Academics have also studied the socioeconomic effect free-to-play games have on consumers.  In one study, the authors compiled several sources analyzing free-to-play games of chance (called "casino" games below) and stated that:

[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a  strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling.

…

According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling.  Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino

---

[1] PC Gamer, *Microtransactions: the good, the bad and the ugly*, http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Aug. 26, 2020)
[2] Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, https://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx (last visited Aug. 26, 2020)

gamers make micro- transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits.[3]

17.     The same authors looked at the link between playing free-to-play games of chance and gambling in casinos.  They stated that "prior research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement."  In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[4]

**A Brief Introduction to Defendant and its Cash Frenzy Casino**

18.     Defendant operates numerous casino-oriented games, including Cash Frenzy, Jackpot Mania, Lotsa, and Dafu.

19.     Defendant's games are available on Android and Apple iOS devices.

**Defendant's Virtual Casino Contains Unlawful Games of Chance**

20.     Consumers visiting Defendant's virtual casino for the first time are awarded 1,500,000 free coins.  Ostensibly, Defendant gives away 1,500,000 coins to each consumer to ensure that they "buy in" to Defendant's casino over alternatives.

21.     After they begin playing, consumers quickly lose their initial allotment chips.

---

[3] Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (last visited Aug. 26, 2020).
[4] *Id.*

CLASS ACTION COMPLAINT
CASE NO.

BURSOR & FISHER, P.A.
888 SEVENTH AVENUE
NEW YORK, NY 10019

-5-

1    Immediately thereafter, Defendant informs them that they have insufficient coins to place a wager,

2    which prevents them from continuing to play the game.

3        22.    To continue playing the game, consumers must purchase additional coins, which

4    can be done by clicking the "BUY" coins button:



13       23.    Upon clicking the button, consumers are presented with options to purchase

14   additional coins, which prices ranging from $1.99 for 750,000 coins to $49.99 to 27,000,000 coins:



23       24.    The decision to sell chips by the thousands isn't an accident.  Rather, Defendant

24   attempts to lower the perceived costs of the coins (costing just a fraction of a penny per coin) while

25   simultaneously maximizing the value of the award (awarding millions of coin in jackpots), further

26   inducing consumers to bet on its games.

27       25.    Armed with these new coins, consumers can resume playing Defendant's slot

machine games.

26.   Once a consumer spins the slot machine by pressing a button, none of Defendant's games allow (or call for) any additional user action.  Instead, the consumer's device communicates with and sends information to Defendant's servers.  Defendant's servers then execute the game's algorithms that determine the spin's outcome.  Notably, none of Defendant's games depend on any amount of skill to determine their outcomes – all outcomes are based entirely on chance.

27.   If a player makes a wager the player can either win and be awarded additional coins or lose and lose the coins.  For example, a player may make a 10,000-coin wager and win 300,000 coins.  In other words, absent the win, the 300,000 coins would have cost the player approximately $0.75 to buy.  Now, however, the newly won coins provide the player additional free plays:



28.   Consumers can continue playing with the coins that they won, or they can exit the game and return at a later time to play because Defendant maintains win and loss records and account balances for each consumer.  Indeed, once Defendant's algorithms determine the outcome of a spin and Defendant displays the outcome to the consumer, Defendant adjusts the consumer's account balance.  Defendant keeps records of each wager, outcome, win, and loss for every Cash Frenzy Casino player and allows the players to view their total winnings or losses from Defendant's casino.

1

## CLASS ALLEGATIONS

2

3          29.     Plaintiff seeks to represent a class defined as all people in the State of Washington

4  who created an account on one of Defendant's virtual casino games and lost purchased coins by

5  wagering at Defendant's virtual casinos (the "Class").  Specifically excluded from the Class are

6  Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts,

7  representatives, employees, principals, servants, partners, joint ventures, or entities controlled by

8  Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated

9  with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and

10 any member of the judge's immediate family.

11         30.     Subject to additional information obtained through further investigation and

12 discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or

13 amended complaint.

14         31.     **Numerosity.**  On information and belief, tens of thousands of consumers fall into

15 the definition of the Class.  Members of the Class can be identified through Defendant's records,

16 discovery, and other third-party sources.

17         32.     **Commonality and Predominance.**  Common questions of law and fact exist as to

18 all members of the Class and predominate over any questions affecting only individual Class

19 members.  These common legal and factual questions include, but are not limited to, the following:

20         (a)     Whether Defendant's virtual casino games are "gambling devices" as defined by
                   RCW § 9.46.0241;

21
           (b)     Whether Plaintiff and each Class member lost money to Defendant as gambling as
22                 defined by RCW § 9.46.0237;

23         (c)     Whether Defendant violated the Washington Consumer Protection Act, RCW
                   19.86.010, *et seq.*; and
24

25         (d)     Whether Defendant has been unjustly enriched as a result of its conduct.

26         33.     **Typicality.**  Plaintiff's claims are typical of the claims of the other members of the

27 Class in that, among other things, all Class members were similarly situated and were comparably

28

---

CLASS ACTION COMPLAINT                                                      BURSOR & FISHER, P.A.
CASE NO.                                                                    888 SEVENTH AVENUE
                                                                            NEW YORK, NY 10019

injured through Defendant's wrongful conduct as set forth herein.  Further, there are no defenses available to Defendant that are unique to Plaintiff.

34.     **Adequacy of Representation.**   Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Class or Subclass.

35.     **Superiority.**   A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would thus be virtually impossible for the Class obtain effective redress for the wrongs committed against the members on an individual basis.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

**COUNT I**
**Violations of RCW § 4.24.070**
**(On Behalf Of Plaintiff And The Class)**

36.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

37.     Plaintiff, members of the Class, and Defendant are all "persons" as defined by RCW § 9.46.0289.

38.     The state of Washington's "Recovery of money lost at gambling" statute, RCW § 4.24.070, provides that "all persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from

the proprietor for whose benefit such game was played or dealt, or such money or things or value

won, the amount of the money or the value of the thing so lost."

39.    "Gambling," as defined by RCW § 9.46.0237, "means staking or risking something

of value upon the outcome of a contest of chance or a future contingent event not under the

person's control or influence."

40.    "Gambling Devices" are defined by RCW § 9.46.0241 as being "(1) Any device or

mechanism the operation of which a right to money, credits, deposits or other things of value may

be created, in return for a consideration, as the result of the operation of an element of chance,

including, but not limited to slot machines, video pull-tabs, video poker, and other electronic games

of chance … .  In the application of this definition, a pinball machine or similar mechanical

amusement device which confers only an immediate and unrecorded right of reply on players

thereof, which does not contain any mechanism which varies the chance of winning free games or

the number of free games which may be won or a mechanism or a chute for dispensing coins or a

facsimile thereof, and which prohibits multiple winnings depending upon the number of coins

inserted and required the playing of five balls individually upon the insertion of a nickel or dime, as

the case may be, to complete any one operation thereof, shall not be deemed a gambling device."

41.    Defendant's casino games, including Cash Frenzy Casino, are "Gambling Devices,"

because they are devices where the players provide consideration (*e.g.*, purchase coins and wager

the coins) and by an element of chance (*e.g.*, by spinning a virtual slot machine) create a right to

credits and/or other things of value (*e.g.*, additional coins that would otherwise be purchased for

cash and that award additional replays).

42.    As such, Plaintiff and the Class gambled when they purchased coins to wager at

Defendant's gambling devices.  Plaintiff and each member of the Class staked money, in the form

of coins purchased with money, at Defendant's games of chance (*e.g.*, Defendant's slot machines

within its casino games, including Cash Frenzy Casino) for the chance of winning additional things

of value (*e.g.*, coins that grant additional free plays).

43.    In addition, Defendant's casino games, including Cash Frenzy Casino, are not

"pinball machine[s] or similar mechanical amusement device[s]" as contemplated by the statute because:

      a.   The games are electronic rather than mechanical;

      b.   The games confer replays but they are recorded and can be redeemed on separate occasions (*i.e.*, they are not "immediate and unrecorded"); and

      c.   The games contain electronic mechanisms that vary the chance of winning free games or the number of free games which may be won (*e.g.*, the games allow or different wager amounts and some allow for the player to win on multiple "lines").

44.    RCW § 9.46.0285 states that a "'Thing of value,' as used in this chapter, means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."

45.    The "coins" Plaintiffs and the Class had the chance of winning in Defendant's virtual casino games, including Cash Frenzy Casino, are "things of value" under Washington law because they are credits that involve the extension of entrainment and a privilege of playing a game without charge.

46.    Defendant's virtual casino games, including Cash Frenzy Casino, are "Contest[s] of change," as defined by RCW § 9.46.0225 because they are "contest[s], game[s], gaming scheme[s], or gaming device[s] in which the outcome[s] depend[] in a material degree upon an element of change, notwithstanding the skill of the contestants may also be a factor therein."  Defendant's games within its virtual casinos, including Cash Frenzy Casino, are programmed to have outcomes that are determined entirely upon chance and a contestant's skill does not affect the outcomes.

47.    RCW § 9.46.0201 defines "Amusement games" as games where the outcomes depend in a material degree upon the skill of the contestant," amongst other requirements. Defendant's virtual casino games, including Cash Frenzy Casino, are not "Amusement games" because their outcomes are dependent entirely upon chance and not upon the skill of the player and because the games are contests of chance, as defined by RCW § 9.46.0225.

48.     As a direct and proximate result of Defendant's operation of its gambling devices, Plaintiff and each member of the Class have lost money wagering at Defendant's games of chance. Plaintiff, on behalf of himself and the Class, seeks an order (1) requiring Defendant to cease operation of its gambling devices; and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

## COUNT II

### Violations of the Washington Consumer Protection Act, RCW § 19.86.010, *et seq.*
### (On Behalf Of Plaintiff And The Class)

49.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

50.     Plaintiff brings this claim against Defendant individually and on behalf of the members of the Class.

51.     Washington's Consumer Protection Act, RCW § 19.86.010, *et seq.* ("CPA"), protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

52.     To achieve that goal, the CPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce …" RCW § 19.86.020.

53.     The CPA states that "a claimant may establish that the act or practice is injurious to the public interest because … it violates a statute that contains a specific legislative declaration of public interest impact."

54.     Defendant violated RCW § 9.46.010, *et seq.*, which declares that:

> The public policy of the State of Washington on gambling is to keep the criminal element out of gambling and to promote the social welfare of the people by limiting the nature and scope of gambling activities and by strict regulation and control.
> It is hereby declared to be the policy of the legislature, recognizing the close relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evil induced by common gamblers

and common gambling houses engaged in professional gambling; and at the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities and social pastimes, which activities and social pastimes are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace.

55.     Defendant has violated RCW § 9.46.010 *et seq.* because its virtual casino games, including Cash Frenzy Casino, are unlawful "gambling device" as defined by RCW 9.46.0241. Defendant's virtual casino games, including Cash Frenzy Casino, are gambling device because they are devices where players provide consideration (*e.g.*, by purchasing coins and wagering the coins) and by an element of chance (*e.g.*, spinning a virtual slot machine) create a right to credits and/or other things of value (*e.g.*, additional coins that would otherwise be purchased for cash, and that award additional replays).

56.     Defendant's acts and practices constitute unfair methods of competition or are unfair or deceptive because (a) they offend public policy as it has been established by law; (b) are unethical, oppressive, or unscrupulous; and (c) cause substantial injury to consumers; and also (d) have the capacity to deceive a substantial portion of the public to whom they are directed and to whom Defendant holds itself out as operating legally and in accordance with applicable law.

57.     Defendant's wrongful conduct occurred in the conduct of trade or commerce--*i.e.*, while Defendant was engaged in the operation of making computer games available to the public.

58.     Defendant's acts and practices were and are injurious to the public interest because Defendant, in the course of its business, continuously advertised to and solicited the general public in Washington state to play its unlawful virtual casino games of chance, including Cash Frenzy Casino. This was part of a pattern or generalized course of conduct on the part of Defendant, and many consumers have been adversely affected by Defendant's conduct and the public is at risk.

59.     Defendant has profited immensely from its operation of unlawful games of chance.

60.     As a result of Defendant's conduct, Plaintiff and the Class members were injured in their business or property--*i.e.*, economic injury--in that they lost money wagering on Defendant's unlawful games of chance.

CLASS ACTION COMPLAINT
CASE NO.

BURSOR & FISHER, P.A.
888 SEVENTH AVENUE
NEW YORK, NY 10019

-13-

61.     Defendant's unfair or deceptive conduct proximately caused Plaintiff's and the Class members' injury because, but for the challenged conduct, Plaintiff and the Class members would not have lost money wagering at or on Defendant's games of chance, and they did so as a direct, foreseeable, and planned consequence of that conduct.

62.     Plaintiff, on her own behalf and on behalf of the Class, seeks to enjoin further violation and recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

**COUNT III**
**Unjust Enrichment**
**(On Behalf Of Plaintiff And The Class)**

63.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

64.     Plaintiff brings this claim against Defendant individually and on behalf of the members of the Class.

65.     Plaintiff and the Class have conferred a benefit upon Defendant in the form of the money Defendant received from them for the purchase of coins to wager at Defendant's virtual casinos, including Cash Frenzy Casino.

66.     The purchase of the coins to wager at Defendant's virtual casinos, including Cash Frenzy Casino, is and was beyond the scope of any contractual agreement between Defendant and Plaintiff and members of the Class.

67.     Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

68.     Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the members of the Class, which Defendant has unjustly obtained as a result of its unlawful operation of slot machines and/or gambling devices. As it stands, Defendant has retained profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

69.     Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

1

## **PRAYER FOR RELIEF**

2       WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

3   judgment against Defendant, as follows:

4       A.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil
            Procedure and naming Plaintiff as the representative for the Class and
5            Plaintiff's attorneys as Class Counsel;

6       B.   For an order declaring the Defendant's conduct violates the laws referenced
            herein;
7

8       C.   For an order finding in favor of Plaintiff and the Class on all counts asserted
            herein;
9

10      D.   For compensatory, statutory, and punitive damages in amounts to be
            determined by the Court and/or jury;
11

12      E.   For prejudgment interest on all amounts awarded;

13      F.   For an order of restitution and all other forms of equitable monetary relief;

14      G.   For injunctive relief as the Court may deem proper; and

15      H.   For an order awarding Plaintiff and the Class their reasonable attorneys' fees
            and expenses and costs of suit.
16
## **DEMAND FOR TRIAL BY JURY**
17

18      Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any

19  and all issues in this action so triable of right.

20  Dated: September 1, 2020              Respectfully submitted,

21                                        **CARSON NOEL PLLC**
22                                        By:_____*/s/ Wright A. Noel*___
                                                Wright A. Noel
23

24                                        Wright A. Noel (State Bar No. 25264)
                                          20 Sixth Avenue NE
25                                        Issaquah, WA 98027
                                          Telephone: (425) 837-4717
26                                        Facsimile: (425) 837-5396
                                          Email: wright@carsonnoel.com
27

28

CLASS ACTION COMPLAINT                                      BURSOR & FISHER, P.A.
CASE NO.                                                    888 SEVENTH AVENUE
                                                            NEW YORK, NY 10019

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
By:_____/s/ Philip L. Fraietta_____
              Philip L. Fraietta

Philip L. Fraietta (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail:  pfraietta@bursor.com
           aleslie@bursor.com
*Attorneys for Plaintiff*