1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| WILLIAM HEATHCOTE individually and on behalf of all others similarly situated, | Case No. 2:20-cv-01310-RSM |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| SPINX GAMES LIMITED, GRANDE GAMES LIMITED, and BEIJING BOLE TECHNOLOGY CO., LTD., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff William Heathcote ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendants SpinX Games Limited, Grande Games Limited, and Beijing Bole Technology Co., Ltd. (collectively, "Defendants"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

**NATURE OF THE ACTION AND FACTS COMMON TO ALL CLAIMS**

1.      Defendants own and operate a leading video game development company in the so-called "casual games" industry – that is, computer games designed to appeal to a mass audience of casual gamers. Amongst the games Defendants own and operate are popular virtual casino games, including virtual casino games under the names "Cash Frenzy™ Casino – Free Slots Games," and

"Vegas Slots – Casino Slots" (hereinafter, the "casino games").

2.      In these casino games, Defendants offer a multitude of electronic versions of slot machine games.  The casino games are available on Android and Apple iOS devices.

3.      Defendants provide a bundle of free "coins" to first-time visitors of its virtual casino that can be used to wager on its slot machine games.  After consumers inevitably lose their initial allotment of coins, Defendants attempt to sell them additional coins starting at $1.99 for 750,000 coins.

4.      Freshly topped off with additional coins, consumers wager to win more coins.  The coins won by consumers playing Defendants' games of chance are identical to the coins that Defendants sell.  Thus, by wagering 750,000 coins that were purchased for $1.99, consumers have the chance to win millions of additional coins that they would otherwise have to purchase.

5.      These coins permit consumers to have the privilege of playing Defendants' games.

6.      By operating its virtual casino, Defendants have violated Washington law, which governs Plaintiff's and the Class's claims, and illegally profited from tens of thousands of consumers.  Accordingly, Plaintiff, on behalf of himself and a Class of similarly situated individuals, brings this lawsuit to recover their losses, as well as costs and attorneys' fees.

## PARTIES

7.      Plaintiff William Heathcote is a natural person and a citizen of the state of Washington.  In or around Spring 2020, Plaintiff began playing Cash Frenzy Casino through his Coolpad cellular phone.  After Plaintiff lost the balance of his initial allocation of free coins, Plaintiff began purchasing coins from Defendants for use in the Cash Frenzy Casino.  Thereafter, Plaintiff continued playing various slot machines and other games of chance within Defendants' casino where he would wager coins for the chance of winning additional coins.  From June 2020 to August 2020, Plaintiff wagered and lost (and Defendants therefore won) approximately $300 at Defendants' games of chance.

8.      Defendant SpinX Games Limited is a Chinese company with its principal place of business located in Hong Kong.  Defendant SpinX Games Limited maintains offices at 2021

1  Fillmore St., #93 San Francisco, CA 94115. Defendant SpinX Games Limited lists this address

2  within the casino games as an address where US-based customers can contact it. Defendant

3  conducts business throughout this District, Washington state, and the United States.

4        9.      Defendant Grande Games Limited is a Chinese company with its principal place of

5  business located in Hong Kong. Defendant Grande Games Limited conducts business throughout

6  this District, Washington state, and the United States.

7        10.     Defendant Beijing Bole Technology Co., Ltd. is a Chinese company with its

8  principal place of business in Beijing. Defendant Beijing Bole Technology Co., Ltd. conducts

9  business throughout this District, Washington state, and the United States.

10  **JURISDICTION AND VENUE**

11        11.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as

12  modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as

13  defined below, is a citizen of a different state than Defendants, there are more than 100 members of

14  the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and

15  costs.

16        12.     This Court has personal jurisdiction over Defendants because Defendants conduct

17  significant business in this District, and because the wrongful conduct occurred in this District.

18        13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial

19  part of the events giving rise to Plaintiff's claims occurred in this District.

20  **FACTUAL ALLEGATIONS**

21  **Free-to-Play and the New Era of Online Gambling**

22        14.     The proliferation of internet-connected mobile devices has led to the growth of so-

23  called "free-to-play" videogames. With free-to-play games, developers encourage consumers to

24  download and play games for free while selling many low-cost items within the game itself.

25  Developers aim to recoup their costs (and make a profit) by selling thousands of "in-game" items

26  that start at $0.99 (purchases known as "micro-transactions") instead of charging an up-front fee.

27        15.     The free-to-play model has become particularly attractive to developers of games of

28

CLASS ACTION COMPLAINT
CASE NO. 2:20-cv-01310-RSM

BURSOR & FISHER, P.A.
888 SEVENTH AVENUE
NEW YORK, NY 10019

1   chance (*e.g.*, slot machine mobile video games), because it allows them to generate huge profits.

2   In 2012, free-to-play games of chance generated over $1.6 billion in worldwide revenue.

3       16.     With free-to-play games of chance, developers have begun exploiting the same

4   psychological triggers as casino operates.  As one respected videogame publication put it:

> If you hand someone a closed box full of promised goodies, many
> will happily pay you for the crowbar to crack it open. The
> tremendous power of small random packs of goodies has long been
> known to the creators of physical collectible card games and
> companies that made football stickers a decade ago. For some …
> the allure of a closed box full of goodies is too powerful to resist.
> Whatever the worth of the randomised [sic] prizes inside, the offer
> of a free chest and the option to buy a key will make a small
> fortune out of these personalities. For those that like to gamble,
> these crates often offer a small chance of an ultra-rare item."[1]

12      17.     *Game Informer*, another respected videogame magazine, reported on the rise (and

13  danger of) micro-transactions in free-to-play games and concluded:

> [M]any new mobile and social titles target small, susceptible
> populations for large percentages of their revenue. If ninety-five
> people all play a [free-to-play] game without spending money, but
> five people each pour $100 or more in to obtain virtual currency,
> the designer can break even. These five individuals are what the
> industry calls whales, and we tend not to be too concerned with
> how they're being used in the equation. While the scale and
> potential financial ruin is of a different magnitude, a similar
> profitability model governs casino gambling.[2]

20      18.     Academics have also studied the socioeconomic effect free-to-play games have on

21  consumers.  In one study, the authors compiled several sources analyzing free-to-play games of

22  chance (called "casino" games below) and stated that:

> [Researchers] found that [free-to-play] casino gamers share
> many similar sociodemographic characteristics (*e.g.*, employment,

---

[1] PC Gamer, *Microtransactions: the good, the bad and the ugly*,
http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Aug. 26, 2020)
[2] Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, https://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx (last visited Aug. 26, 2020)

education, income) with online gamblers. Given these similarities,
it is perhaps not surprising that a  strong predictor of online
gambling is engagement in [free-to-play] casino games. Putting a
dark line under these findings, over half (58.3%) of disordered
gamblers who were seeking treatment stated that social casino
games were their first experiences with gambling.

…

According to [another study], the purchase of virtual credits or
virtual items makes the activity of [free-to-play] casino gaming
more similar to gambling.  Thus, micro-transactions may be a
crucial predictor in the migration to online gambling, as these
players have now crossed a line by paying to engage in these
activities. Although, [sic] only 1–5% of [free-to-play] casino
gamers make micro- transactions, those who purchase virtual
credits spend an average of $78. Despite the limited numbers of
social casino gamers purchasing virtual credits, revenues from
micro-transactions account for 60 % of all [free-to-play] casino
gaming revenue. Thus, a significant amount of revenue is based on
players' desire to purchase virtual credits above and beyond what
is provided to the player in seed credits.[3]

19.     The same authors looked at the link between playing free-to-play games of chance

and gambling in casinos.  They stated that "prior research indicated that winning large sums of

virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online

gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-

transaction engagement."  In fact, "the odds of migration to online gambling were approximately

*eight times greater* among people who made micro-transactions on [free-to-play] casino games

compared to [free-to-play] casino gamers who did not make micro-transactions."[4]

**A Brief Introduction to Defendant and its Cash Frenzy Casino**

---

[3] Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (last visited Aug. 26, 2020).
[4] *Id.*

CLASS ACTION COMPLAINT
CASE NO. 2:20-cv-01310-RSM

BURSOR & FISHER, P.A.
888 SEVENTH AVENUE
NEW YORK, NY 10019

-5-

20.     Defendants operate numerous popular, casino-oriented games, including Cash Frenzy, Vegas Friends, Jackpot Mania, Lotsa, and Dafu.

21.     Defendants' games are available on Android and Apple iOS devices.

**Defendant's Virtual Casino Contains Unlawful Games of Chance**

22.     Consumers visiting Defendant's virtual casino for the first time are awarded 1,500,000 free coins.  Ostensibly, Defendants give away 1,500,000 coins to each consumer to ensure that they "buy in" to Defendants' casino over alternatives.

23.     After they begin playing, consumers quickly lose their initial allotment chips. Immediately thereafter, Defendants inform them that they have insufficient coins to place a wager, which prevents them from continuing to play the game.

24.     To continue playing the game, consumers must purchase additional coins, which can be done by clicking the "BUY" coins button:



25.     Upon clicking the button, consumers are presented with options to purchase additional coins, which prices ranging from $1.99 for 750,000 coins to $49.99 to 27,000,000 coins:

---

26.     The decision to sell chips by the thousands isn't an accident.  Rather, Defendants

attempts to lower the perceived costs of the coins (costing just a fraction of a penny per coin) while

simultaneously maximizing the value of the award (awarding millions of coin in jackpots), further

inducing consumers to bet on its games.

27.     Armed with these new coins, consumers can resume playing Defendants' slot

machine games.

28.     Once a consumer spins the slot machine by pressing a button, none of Defendants'

games allow (or call for) any additional user action.  Instead, the consumer's device communicates

with and sends information to Defendants' servers.  Defendants' servers then execute the game's

algorithms that determine the spin's outcome.  Notably, none of Defendants' games depend on any

amount of skill to determine their outcomes – all outcomes are based entirely on chance.

29.     If a player makes a wager the player can either win and be awarded additional coins

or lose and lose the coins.  For example, a player may make a 10,000-coin wager and win 300,000

coins.  In other words, absent the win, the 300,000 coins would have cost the player approximately

$0.75 to buy.  Now, however, the newly won coins provide the player additional free plays:

30.    Consumers can continue playing with the coins that they won, or they can exit the game and return at a later time to play because Defendants maintain win and loss records and account balances for each consumer.  Indeed, once Defendants' algorithms determine the outcome of a spin and Defendants display the outcome to the consumer, Defendants adjust the consumer's account balance.  Defendants keep records of each wager, outcome, win, and loss for every Cash Frenzy Casino player and allows the players to view their total winnings or losses from Defendants' casino.

## CLASS ALLEGATIONS

31.    Plaintiff seeks to represent a class defined as all people in the State of Washington who created an account on one of Defendants' virtual casino games and lost purchased coins by wagering at Defendants' virtual casinos (the "Class").  Specifically excluded from the Class are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

32.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or

amended complaint.

33.     **Numerosity.**  On information and belief, tens of thousands of consumers fall into the definition of the Class.  Members of the Class can be identified through Defendants' records, discovery, and other third-party sources.

34.     **Commonality and Predominance.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)     Whether Defendants' virtual casino games are "gambling devices" as defined by RCW § 9.46.0241;

(b)     Whether Plaintiff and each Class member lost money to Defendants as gambling as defined by RCW § 9.46.0237;

(c)     Whether Defendants violated the Washington Consumer Protection Act, RCW 19.86.010, *et seq.*; and

(d)     Whether Defendants have been unjustly enriched as a result of its conduct.

35.     **Typicality.**  Plaintiff's claims are typical of the claims of the other members of the Class in that, among other things, all Class members were similarly situated and were comparably injured through Defendants' wrongful conduct as set forth herein.  Further, there are no defenses available to Defendants that are unique to Plaintiff.

36.     **Adequacy of Representation.**  Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Class or Subclass.

37.     **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would thus be virtually impossible for the Class

obtain effective redress for the wrongs committed against the members on an individual basis. Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

<u>COUNT I</u>
**Violations of RCW § 4.24.070**
**(On Behalf Of Plaintiff And The Class)**

38.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

39.     Plaintiff, members of the Class, and Defendants are all "persons" as defined by RCW § 9.46.0289.

40.     The state of Washington's "Recovery of money lost at gambling" statute, RCW § 4.24.070, provides that "all persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things or value won, the amount of the money or the value of the thing so lost."

41.     "Gambling," as defined by RCW § 9.46.0237, "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence."

42.     "Gambling Devices" are defined by RCW § 9.46.0241 as being "(1) Any device or mechanism the operation of which a right to money, credits, deposits or other things of value may be created, in return for a consideration, as the result of the operation of an element of chance, including, but not limited to slot machines, video pull-tabs, video poker, and other electronic games of chance … .  In the application of this definition, a pinball machine or similar mechanical amusement device which confers only an immediate and unrecorded right of reply on players

thereof, which does not contain any mechanism which varies the chance of winning free games or the number of free games which may be won or a mechanism or a chute for dispensing coins or a facsimile thereof, and which prohibits multiple winnings depending upon the number of coins inserted and required the playing of five balls individually upon the insertion of a nickel or dime, as the case may be, to complete any one operation thereof, shall not be deemed a gambling device."

43.     Defendants' casino games, including Cash Frenzy and Vegas Friends, are "Gambling Devices," because they are devices where the players provide consideration (*e.g.*, purchase coins and wager the coins) and by an element of chance (*e.g.*, by spinning a virtual slot machine) create a right to credits and/or other things of value (*e.g.*, additional coins that would otherwise be purchased for cash and that award additional replays).

44.     As such, Plaintiff and the Class gambled when they purchased coins to wager at Defendants' gambling devices.  Plaintiff and each member of the Class staked money, in the form of coins purchased with money, at Defendants' games of chance (*e.g.*, Defendants' slot machines within its casino games, including Cash Frenzy Casino) for the chance of winning additional things of value (*e.g.*, coins that grant additional free plays).

45.     In addition, Defendants' casino games, including Cash Frenzy Casino, are not "pinball machine[s] or similar mechanical amusement device[s]" as contemplated by the statute because:

   a.   The games are electronic rather than mechanical;
   b.   The games confer replays but they are recorded and can be redeemed on separate occasions (*i.e.*, they are not "immediate and unrecorded"); and
   c.   The games contain electronic mechanisms that vary the chance of winning free games or the number of free games which may be won (*e.g.*, the games allow or different wager amounts and some allow for the player to win on multiple "lines").

46.     RCW § 9.46.0285 states that a "'Thing of value,' as used in this chapter, means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a

game or scheme without charge."

47.     The "coins" Plaintiffs and the Class had the chance of winning in Defendants'
virtual casino games, including Cash Frenzy Casino, are "things of value" under Washington law
because they are credits that involve the extension of entrainment and a privilege of playing a game
without charge.

48.     Defendants' virtual casino games, including Cash Frenzy Casino, are "Contest[s] of
change," as defined by RCW § 9.46.0225 because they are "contest[s], game[s], gaming scheme[s],
or gaming device[s] in which the outcome[s] depend[] in a material degree upon an element of
change, notwithstanding the skill of the contestants may also be a factor therein."  Defendants'
games within its virtual casinos, including Cash Frenzy and Vegas Friends, are programmed to
have outcomes that are determined entirely upon chance and a contestant's skill does not affect the
outcomes.

49.     RCW § 9.46.0201 defines "Amusement games" as games where the outcomes
depend in a material degree upon the skill of the contestant," amongst other requirements.
Defendants' virtual casino games, including Cash Frenzy and Vegas Friends, are not "Amusement
games" because their outcomes are dependent entirely upon chance and not upon the skill of the
player and because the games are contests of chance, as defined by RCW § 9.46.0225.

50.     As a direct and proximate result of Defendants' operation of its gambling devices,
Plaintiff and each member of the Class have lost money wagering at Defendants' games of chance.
Plaintiff, on behalf of himself and the Class, seeks an order (1) requiring Defendants to cease
operation of its gambling devices; and/or (2) awarding the recovery of all lost monies, interest, and
reasonable attorneys' fees, expenses, and costs to the extent allowable.

## COUNT II
**Violations of the Washington Consumer Protection Act, RCW § 19.86.010,** *et seq.*
**(On Behalf Of Plaintiff And The Class)**

51.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

52.     Plaintiff brings this claim against Defendants individually and on behalf of the

members of the Class.

53.     Washington's Consumer Protection Act, RCW § 19.86.010, *et seq.* ("CPA"),

protects both consumers and competitors by promoting fair competition in commercial markets for

goods and services.

54.     To achieve that goal, the CPA prohibits any person from using "unfair methods of

competition or unfair or deceptive acts or practices in the conduct of any trade or commerce …"

RCW § 19.86.020.

55.     The CPA states that "a claimant may establish that the act or practice is injurious to

the public interest because … it violates a statute that contains a specific legislative declaration of

public interest impact."

56.     Defendants violated RCW § 9.46.010, *et seq.*, which declares that:

> The public policy of the State of Washington on gambling is to
> keep the criminal element out of gambling and to promote the
> social welfare of the people by limiting the nature and scope of
> gambling activities and by strict regulation and control.
> It is hereby declared to be the policy of the legislature, recognizing
> the close relationship between professional gambling and
> organized crime, to restrain all persons from seeking profit from
> professional gambling activities in this state; to restrain all persons
> from patronizing such professional gambling activities; to
> safeguard the public against the evil induced by common gamblers
> and common gambling houses engaged in professional gambling;
> and at the same time, both to preserve the freedom of the press and
> to avoid restricting participation by individuals in activities and
> social pastimes, which activities and social pastimes are more for
> amusement rather than for profit, do not maliciously affect the
> public, and do not breach the peace.

57.     Defendants have violated RCW § 9.46.010 *et seq.* because its virtual casino games,

including Cash Frenzy and Vegas Friends, are unlawful "gambling device" as defined by RCW

9.46.0241.  Defendants' virtual casino games, including Cash Frenzy Casino, are gambling device

because they are devices where players provide consideration (*e.g.*, by purchasing coins and

wagering the coins) and by an element of chance (*e.g.*, spinning a virtual slot machine) create a

right to credits and/or other things of value (*e.g.*, additional coins that would otherwise be

purchased for cash, and that award additional replays).

58.     Defendants' acts and practices constitute unfair methods of competition or are unfair or deceptive because (a) they offend public policy as it has been established by law; (b) are unethical, oppressive, or unscrupulous; and (c) cause substantial injury to consumers; and also (d) have the capacity to deceive a substantial portion of the public to whom they are directed and to whom Defendants hold themselves out as operating legally and in accordance with applicable law.

59.     Defendants' wrongful conduct occurred in the conduct of trade or commerce--*i.e.*, while Defendants were engaged in the operation of making computer games available to the public.

60.     Defendants' acts and practices were and are injurious to the public interest because Defendants, in the course of their business, continuously advertised to and solicited the general public in Washington state to play its unlawful virtual casino games of chance, including Cash Frenzy and Vegas Friends. This was part of a pattern or generalized course of conduct on the part of Defendants, and many consumers have been adversely affected by Defendants' conduct and the public is at risk.

61.     Defendants have profited immensely from its operation of unlawful games of chance.

62.     As a result of Defendants' conduct, Plaintiff and the Class members were injured in their business or property--*i.e.*, economic injury--in that they lost money wagering on Defendants' unlawful games of chance.

63.     Defendants' unfair or deceptive conduct proximately caused Plaintiff's and the Class members' injury because, but for the challenged conduct, Plaintiff and the Class members would not have lost money wagering at or on Defendants' games of chance, and they did so as a direct, foreseeable, and planned consequence of that conduct.

64.     Plaintiff, on his own behalf and on behalf of the Class, seeks to enjoin further violation and recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

CLASS ACTION COMPLAINT
CASE NO. 2:20-cv-01310-RSM

BURSOR & FISHER, P.A.
888 SEVENTH AVENUE
NEW YORK, NY 10019

-14-

**COUNT III**
**Unjust Enrichment**
**(On Behalf Of Plaintiff And The Class)**

65.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

66.     Plaintiff brings this claim against Defendants individually and on behalf of the members of the Class.

67.     Plaintiff and the Class have conferred a benefit upon Defendants in the form of the money Defendant received from them for the purchase of coins to wager at Defendants' virtual casinos.

68.     The purchase of the coins to wager at Defendants' virtual casinos, including Cash Frenzy and Vegas Friends, is and was beyond the scope of any contractual agreement between Defendants and Plaintiff and members of the Class.

69.     Defendants appreciate and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

70.     Under principles of equity and good conscience, Defendants should not be permitted to retain the money obtained from Plaintiff and the members of the Class, which Defendants have unjustly obtained as a result of its unlawful operation of slot machines and/or gambling devices. As it stands, Defendant have retained profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

71.     Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendants have retained as a result of the unlawful and/or wrongful conduct alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative for the Class and Plaintiff's attorneys as Class Counsel;

1
2

    B.    For an order declaring the Defendants' conduct violates the laws referenced herein;

3

    C.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

4
5

    D.    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

6

    E.    For prejudgment interest on all amounts awarded;

7

    F.    For an order of restitution and all other forms of equitable monetary relief;

8

    G.    For injunctive relief as the Court may deem proper; and

9
10

    H.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

11

## DEMAND FOR TRIAL BY JURY

12
13
14

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

15

Dated: April 9, 2021          Respectfully submitted,

16

**CARSON NOEL PLLC**
By:    */s/ Wright A. Noel*

17

Wright A. Noel

18
19

Wright A. Noel (State Bar No. 25264)
20 Sixth Avenue NE
Issaquah, WA 98027

20

Telephone: (425) 837-4717
Facsimile: (425) 837-5396

21

Email: wright@carsonnoel.com

22
23

**BURSOR & FISHER, P.A.**
By:    */s/ Philip L. Fraietta*

24

Philip L. Fraietta

25
26

Philip L. Fraietta (*pro hac vice* pending)
Alec M. Leslie (*pro hac vice* pending)

27

888 Seventh Avenue
New York, NY 10019

28

CLASS ACTION COMPLAINT
CASE NO. 2:20-cv-01310-RSM

BURSOR & FISHER, P.A.
888 SEVENTH AVENUE
NEW YORK, NY 10019

1
2
3

Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail:  pfraietta@bursor.com
            aleslie@bursor.com

4

*Attorneys for Plaintiff*

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT
CASE NO. 2:20-cv-01310-RSM

BURSOR & FISHER, P.A.
888 SEVENTH AVENUE
NEW YORK, NY 10019